Thank you, Your Honor. My name is Ed Wassmuth. I represent Vision Airlines. This case somewhat comes to this Court in a very unusual posture. I'm going to try to reserve five minutes for rebuttal. All right. Procurator, what's the clock? Yes, Your Honor. It comes to us in an unusual posture in that there was a default entered as a discovery sanction against my client on the eve of trial after the certification of a class. We've laid out a number of legal issues in our briefs, and I'm sure Your Honors have a chance to read those. But let me say that sort of backing up a second, this case is really about two sets of relationships. One is the relationship between Vision and its upstream contracting partners, and the other set of relationships between Vision and its employees. What the class did, and I think where the district court erred, was focus exclusively on that first set of relationships, the relationship between Vision and its upstream partners, rather than the relationship between Vision and its employees. When you give that second set of relationships proper weight, we think the judgment has to be set aside. The class members were hired to fly these planes to the Middle East. They were our employees. That's what the pleadings say. What they're pleading for is some form of compensation, which they say they were unaware of, but was in addition to their normal pay. So by what they paid, they received normal pay. They don't say we deceived them about their pay or about the work they were going to perform, but they're entitled to this other compensation that they didn't know about. So the unavoidable truth here in this complaint is that the employees received exactly what they were expected to receive for the work they expected to perform. And one way to see that is look how the trial judge framed the damage issue when we got to the damage trial. This is from page one of the supplemental excerpt of the record. And the district court judge said, Flight crews agreed to a sum certain in their pay before they knew there was money paid for hazard pay to vision. So I'm going to permit the defendant to introduce some evidence that the hazard pay was calculated into the pay of flight crews, but they're not going to be able to introduce documents to prove that. And what they did at trial was say, well, to prove their damages was to say, here's the amount of money vision is alleged to have received for all pay, and here's the amount that it actually paid out, and the damages is a difference. So again, there's acknowledgement that the employees received compensation, and they don't claim that compensation with anything other than what they expected to receive. And we say in light of that, the judgment has to be set aside. Now, this is a default judgment that was entered. But the fact that it's a default judgment under the precedence of this court doesn't mean this court can't look and make a determination as a matter of law, just as it would on reviewing a motion to dismiss, that the well-pleaded factual allegations of the complaint don't state a viable claim for relief. It's the same test that would apply in review of a 12b6 motion. I've cited a number of cases where this court has, in fact, done that. Said, here's a default. We're going to nevertheless look at the well-pleaded factual allegations and then set aside the judgment. Now, what's not well-pleaded here? First, you have to put aside the conclusory things, you know, labels like something's unjust or inequitable, you know, or that they have Title II hazard pay on their conversion claim. What are the facts? The fact that is pled is that Vision has claimed to have made commitments to its upstream contracting partners to pay hazard pay. And that's it. That's the core contention of the class. Our contention is that under Nevada law and under well-recognized common law principles, if someone has a compensation arrangement, they do the work they expect to perform, they receive the compensation they expect to receive. The theory is that they received money intended for the plaintiffs here, and they converted that money instead of paying it over to the person whose benefit they received it. Well, let's talk about conversion. All they say, it's a conclusory allegation to say they have Title II and rights and hazard pay. Nevada law is very specific. They have the act to have a conversion. This is the MC multifamily case we cite in our brief. It says, a distinct act of dominion wrongfully executed over another's personal property in denial of or inconsistent with his title or rights therein. They don't have title to a specific fund of money. They claim they have a contractual right to be paid money. That's different than claiming a right in a specific segregated fund. We cite a number of cases. Let me read something from one. This is the Wood Industrial case. It's an Oregon case, but it applies a principle that we cite in a number of different cases. It says, money under certain circumstances may become the subject of conversion, but there can be no conversion of money unless it was wrongfully received by the party charged with a conversion or unless such party was under an obligation to return specific money to the party claiming it. And there are numerous cases that we cite where if you're going to have a conversion of money, you have to say someone is entitled to not just a specific amount of money, but specific monies. Well, Nevada may have a little more of a common law approach to money had and received than what you're talking about. But I want to cut to the chase. You say you're appealing from this default. Yes, sir. Where are the lawyers who performed this withholding of information under Rule 16 under the discovery procedures? Well, they were placed. We were not. Where are they? Where are they? They're physically in Nevada. Are they members of the bar? Yes, sir. In Nevada? Yes, sir. Yes, Your Honor. And they were not.  They were not members of the bar. Shouldn't they be a little bit surprised that the Court means what it says when it tells them that they've got to perform some discovery and they don't do it? No. I don't – let me – let's talk a little bit about the discovery sanction itself. You know, I … Well, that's the nut of the case, isn't it? No, no. You want to get rid of that default. No, no. You've got to separate two things, Your Honor. One is whether or not it was an appropriate sanction to strike the answer. That's the first question. No, that's the main question. What's your answer to that? No, because we say the district court did not consider a more appropriate, lesser sanction. That's several pages in his order discussing other appropriate. But he didn't discuss the one that was the most appropriate, and that was making determinations of fact on the upstream relationship and letting the case go to trial with those facts established and then let us try the downstream relationship and its effect on the claims because there was no lack of discovery alleged on the pay that … I've been a district judge, and I've looked at a lot of Rule 16 controversies. I've never seen a performance as outrageous, audacious, and a poster child for Hutzpah than the performance of these lawyers in this case. Your Honor, I'm not going to stand here, and we didn't in our brief try to justify all the conduct. But we urge the Court to say, like, look, this Court did in Allen Newman Productions v. Albright. There are two distinct questions. One is, is striking the answer appropriate? And then once you say, okay, yes, it's appropriate to strike the answer, then you say, do the well-pleaded factual allegations of the complaint, putting aside legal conclusions, does that state a claim for a viable claim for relief? And that's the question in the first part of our appeal we asked this Court to focus on, In that sense, this is no different than a case in which a defendant is served and doesn't answer. In the one case, the Levine case that we cite, the defendant showed up and then said, I want to withdraw my answer. I'll take a default. I want to withdraw my answer. And this Court nevertheless said, we have to look at whether or not the well-pleaded factual allegations of the complaint state a claim for relief. And that's what we asked this Court to do. I mean, it's interesting. You look at the Allen Newman case. In that case, first part of the opinion, the Court said the district court appropriately entered a default. And then it said, you know, although the entry of default was within the Court's discretion, Albright may contest the legal sufficiency of allegations contained in the complaint. And then it went ahead and set aside the RICO judgment because it said the well-pleaded allegations in that complaint didn't state a RICO claim. And that's what we're asking this Court to do. I'm not going to apologize. I'm not going to try and justify or explain away the discovery issue, except to say I think the Court should have considered a different alternative sanction. But the Court spent a lot of time considering. I agree it did in its opinion, but I think for the reason we set forth in our brief, it didn't consider the most appropriate one. And that was because the discovery disputes were about the upstream relationships, let's deem the facts alleged about those upstream relationships to be admitted and then try the rest of the case on the merits. Because we think that those downstream relationships are critical. These are employees who were compensated, received exactly what they expected to receive. And under those circumstances, you can't have a claim for unjust enrichment. You can't have a claim for a sumpset or quantum merowit. And you can't have a conversion claim. Because let me focus. I've got a couple of minutes before I get to my rebuttal time. Let me say one thing about class certification, because I think this somewhat brings home the point I'm trying to make. You know, they want to say you didn't. Well, you probably weren't there, but the defendant had several opportunities to bring forward contracts which they claimed they had. They had several opportunities to bring forward the real agreement and didn't produce anything. Right. So what are we supposed to do? Well, that's to say that the alternative we would propose, we say it was more appropriate and not considered by the district court, was to deem the facts the plaintiff alleges about those contracts, deem those admitted. Because we don't think that in itself is enough to establish liability. Because these were compensated employees. You'd be surprised about Nevada law. This is a diversity case. And Nevada law has a lot of common law in it. I agree. Including the WOLSAC, equitable remedies. Well, the remedy we think is Nevada law, I think, we think is clear in that if you have an employee who receives, does the work he expects to do, receives the compensation he respects to receive, he cannot go back after the fact and assert claims for unjust enrichment, quantum narrow it, money had and received, to receive additional compensation. I think we cite a number of cases where that's a well-established common law principle. But let me focus one on the classification, because, like I said, I think it brings home one of the points we're trying to make. And that is they want to say, okay, we have they plead a conclusion. There's no employment contracts with Vision. And they offer up Mr. Hester as a class representative for that class of employees. In support of his own classification motion, Mr. Hester put in his pay stubs, which showed he received about $200,000 over the course of 22 months. And Vision put in the pay memo, which outlined, at least for half of that period, how he was paid a certain amount of salary and a certain hourly rate compensation flight time. We submit this impales the class on the horns of a dilemma. If there's supposed to be this class of employees who don't have compensation agreements and therefore can assert these conversion and equitable claims, Mr. Hester can't be a typical representative of that class, because he plainly had a compensation agreement with Vision. He received $200,000. And so, based on their own factual submission, there can't be a typicality. And if he is typical, then as a matter of law, the class has to fail, because this is exactly what happened. The class members received exactly what they expected to receive. And in light of that, you cannot assert common law, equitable, implied contract claims to rewrite that compensation arrangement. And I'll reserve the rest of my time for rebuttal. Thank you. I may have pleased the Court. David Buckner for the plaintiff and the class. There's a number of things I have to unpack here. One of the issues that's, I think, front and center in this appeal, as it was front and center below, is Vision, as the district court found, repeatedly misled the district court. And with all due respect to Mr. Wasmuth, it wasn't trial counsel. They're still trying to do it. First of all, and I'm going to work – I'm going to try and work through this methodically. They've raised so many issues, though, and it raises a number of issues. Kennedy. But why don't we start at the end? Yes, sir. What is the response to the argument that Mr. Hester was not a typical employee because he was employed? Yes, sir. He was an employee. I have several responses. First, that was not raised as a basis for destroying typicality, commonality, adequacy, or predominance below. They're raising it for the first time on appeal. Below, their argument was he was atypical because they had unique counterclaims against him. The district court ultimately granted us summary judgment against Vision on those counterclaims. And so now on appeal for the first time, they're arguing that he has a different employment relationship. If you look at the order on summary judgment that the district court entered, it specifically found, and this I'll discuss more in a moment, that there was no employment contract, no express written agreement between Mr. Hester or any member of the class and Vision. And that's the important point under Nevada law. Under Nevada law, if there's an express written agreement, you cannot appeal to equity. However, if there is no express written agreement, you can. They have been throughout this case, and they do it on appeal a number of times in their brief, and they've done it here today. They suggest that there might be some contract or something out there that they've never produced. And the district court made a finding on this below at summary judgment and found there was no express employment agreement among any member of the class and Vision. The fact is, what they're trying to do is use the suggestion that there's some relationship to establish an express written employment agreement to annihilate our claims in equity, but they've never offered it. And I think what's important to remember, too, here, and I know I'm jumping around a little, so I apologize, but we're looking at this case from the point of the complaint because of the default. And I would submit to this Court, and I'll address in a moment, that the district court was beyond patient with these defendants. Their conduct was outrageous. They destroyed documents, and the prejudice is patent. Even now, Vision has won this case. The reason they've won is there were four phases to the air bridge. We were only able to prove damages as to three of them because the documents on phase one were never produced. We could get them from no other source. We traveled all over the country going to different district courts trying to get the documents from other parties that Vision wouldn't produce. And it will be no surprise to this Court that when we stood, for example, in the eastern district of Virginia trying to get documents from one of the contractors above Vision, the magistrate judge there very reasonably said to me, well, these documents, the subpoena recipient, the upstream contractor, says are in Vision's possession. Don't you think you should go get them from Vision? And, of course, I said, well, Your Honor, we're doing the best we can. And, of course, at the end of the day, we weren't able to get them from Vision. We got some documents from the upstream contractor. Second, so that's the first point. Going back to your point about whether Mr. Hester has a unique compensation arrangement, that it wasn't raised below. Second of all, if there is an express employment agreement between Vision and its employees, it is a common issue. That is, it either exists or it doesn't. If it has an express employment relationship with its employees such that claims in equity are destroyed, that is, in fact, a common issue. And, of course, supports certification. Again, this wasn't raised below. It's raised for the first time on appeal. That's why the district judge didn't get a chance to consider it. But even if there were an express employment agreement, something they'd never produced at any point in this case, and no one ever stopped them from producing one. But they've never produced it. Even if it existed, it's a common issue because it's a common question about whether that would undermine our claims in equity. Second, I want to go back to the sanction here for a moment. Mr. Wasmuth says that the issue of the sanction and the documents that we didn't receive had to do with the relationship between Vision and the contractors above it, but not Vision and its employees. That is, with all respect to him, patently false. And all you need to do is go to the order that the district judge issued on sanctions, where you will find that among the documents Vision did not produce is the computerized spreadsheets by their chief pilot, who was calculating the pay of the pilots and flight crews, and he said that it was on his computer at deposition, and then when we demanded that they produce it, it turned out that it had been destroyed. Why is that relevant? Vision, despite the default, came into trial and argued that they had included within the pay the employees had received the hazard pay that they were entitled to. And they were able to make that argument with precious little rebuttal from us, except what we were able to cobble together, because they had destroyed the most salient evidence as to whether that was in fact true from 2007 on. That is, the spreadsheets that showed how the employee pay was actually calculated. So to say that this relates only to the upstream contractors and not to Vision's relationship with his employees is patently false. Beyond that, we know that the district court found that emails between Vision's management and its employees were destroyed, that at the time the sanction order was entered, Vision's upper management continued to destroy emails, even as the court had repeatedly warned Vision that sanctions were on the way. And that is why the conduct here is particularly outrageous. They still got their trial on some of the merits and were able to use the default against us. Nonetheless, we prevailed. Now they want to unring the bell. They fault the district court for not considering alternate sanctions. First, as Your Honors know, under the law of the circuit, the Anderson case in particular, courts are not required to consider every sanction. Second, under the Leon case, there was a document destruction case, and this court found that because the document destruction had occurred before the district court had the opportunity to consider alternate sanctions, it didn't need to. I would submit to this Court that not only did this Court consider the district court consider alternate sanctions, it even imposed one. Right before the sanction, in September of 2010, the district court said to Vision, first, produce those documents forthwith, and second, you will not get to depose the classes expert if you don't produce the data that he needs to do his analysis of the damages. Vision never produced the data. They never got to depose our expert. They then had the, using Your Honors' term, the chutzpah, to come in and argue with the sanctions motion, that because they had already been sanctioned and not letting them, not being able to depose our expert because of that misconduct, that was enough sanction and they shouldn't get any more. And the district judge said, come on now, that was the sanction for that abuse. I warned you. I told you there would be more. That sanction, we were sanctioned once. Here you are, you're still committing misconduct, and you want me to just, you know, give you the benefit of your misconduct. And, of course, he sanctioned them. For them now to say, oh, well, you know, he didn't consider every possible outcome, first of all, he didn't need to, and second of all, it frankly isn't true. One of the things that the district judge found was that because of Vision's destruction of evidence, the class was going to be forced to go to trial with spotty and incomplete evidence, and under the law of this circuit, that's the basis alone for imposing and maintaining a default against a defendant. And so to say, well, we should get Vision, as it does, say, well, we should get the sanction should have simply been that the upstream relationship was found as a matter of law and fact, but the downstream relationship could be tested, doesn't even hold up with the facts of the case. To give them to take their argument where it has to go under these facts, if, not if, the district judge found that the documents related to both the upstream and the downstream relationship were destroyed and were continuing to be destroyed. That means that what the class should have received was a presumption, not a presumption, a finding of fact under Vision's own argument that Vision wasn't required to pay the hazard pay over to employees and that it didn't do so. Vision actually did better than that at trial because the first part of the presumption was actually put in place. The district judge instructed the jury that Vision had an obligation to pay hazard pay to its employees. The second part, they got to test. They got to argue at trial that it had been paid. To do what they want now, to impose the findings of fact that they want and the conclusions of law, leaves nothing for the jury except for damages, which is better than they did below. They're just nitpicking because they're trying to get out from under this very well reasoned sanction order by a district judge who was imminently patient with these guys and who repaid him by, frankly, with all respect to this Court, engaging in some of the worst discovery abuse I've ever seen. And I'm older than I look. I've never seen anything like this. I mean, it was outright contempt of the district court. Kennedy, still pretty young by comparison. Thank you, sir. I'm trying to hold it together, but, you know. But it was outright contempt of the district court. And that kind of contempt can't be permitted. And I think one aspect of this case that screams out for this Court's deference to the district court is that when a district judge makes these kinds of findings and tries to prevent this kind of discovery abuse and is unable to because of the active, willful misconduct by a party, by a litigant, I think it's incumbent upon the appellate court to back up the district court, something like that. Because of that. Roberts, what about the conversion argument? Let me deal with that. So with regard to conversion, Vision Mr. Wazemuth argues that we can't bring a claim like this or any of these claims because under Nevada law, we can't state a claim. First of all, I would remind the Court that, again, we're viewing the complaint from the motion-to-dismiss stage. We have to simply, under Twombly and Iqbal, take the allegations in the complaint and they have to be sufficient to take us past the speculative level. I would submit, and I'll go through the allegations briefly in a second, that we've done that. But I would point the Court in particular to Judge Proh's decision in the In re. Walmart wage and hour litigation. In that case, it was an MDL, and among the things he considered was whether claims in equity could be barred by the existence of an employment relationship under Nevada law. And what he found was that there was the employees there had stated a claim, that they could still recover, and that because they could still recover, they were entitled to survive the motion-to-dismiss because there was at least a theory under which they could recover. Now, I don't want to delve too deeply into this because it's complicated, but here's what Visions really say. It's saying that because it employed these people, they had an express employment contract. The district court already found that they didn't. So then it's saying, well, they must have some kind of agreement. Well, that's not relevant because the only reason you can block any of the claims in equity is if they had an express employment agreement. Their own employee handbook says you have neither an express nor an implied employment agreement with Visions. There is no case under Nevada law, by the way. And that's, I digress from the Court's question because you asked about conversion. Conversion isn't barred by an express employment agreement anyway because it's a claim at law, not at equity. There is no case that Visions has cited under Nevada law that says you cannot pursue a conversion claim under these facts. If you look, for example, at the Larson case, which we do cite, which is the Nevada Supreme Court, that was a case where, and I don't want to get too deeply into it, but that was a case where 15,000 unchanged dollars were paid to one of two parties that really belonged to the other party. And the party who received the money understood fully that he was supposed to pay it over to the other guy, that it was his money. And instead, he put it in his own bank account. He paid a debt of one of the other party's customers and then kept the rest of the money for himself. And the Nevada Supreme Court said, even though it's money, even though it was commingled in his account, even though it's not specifically set aside anywhere in a separate body, you know, in a lockbox or whatever, it's still capable of conversion. And I would submit that the facts of our case on conversion are even better. Because what we have here is, as alleged in the complaint, the United States government set aside specific sums of money in its contracting with the upstream contractors and said, this sum of money is for paying your employees. This sum of money is for hiring the aircraft or leasing them. And this sum of money is for hazard pay. And you upstream contractors have to pay that through without taking a cut. And anybody you work with downstream, any other contractors, have to pay it through the employees without taking a cut. That's alleged in our complaint. And because it says that, that money was, in fact, even a more specific sum of money than the $15,000 that was paid over in the Larson case that the Nevada Supreme Court found was sufficient to allege conversion. But we go a step further in the complaint, because we say that Vision made a commitment to paying specific sums of money to the pilots and the flight crews for each takeoff and landing in the war zone. So you have a specific sum of money coming down from the upstream contractors to Vision, from which Vision is not supposed to take a cut, as alleged in the complaint. And you have a specific subset of that money that goes to each of our class members because for each takeoff and landing that they do in the war zone. All that's alleged in the complaint. And under Nevada law, that is adequate to say to claim a conversion. Under Larson, under Lopez, and the other cases we cited in our brief. Are you ready for the punitive damages issue? I'm sorry. Are you ready for the punitive damages? I will move to punitive damages with Your Honor's suggestion. With regard to punitive damages, I think this is the one place where, with all respect to the district judge, he took a too narrow view of where we were in the case. He, I think, was looking at the case law, I don't know, but I think he was looking at the case law relating to what Vision was entitled to argue or not argue, and held us to the allegations in our complaint and said that the allegations in our complaint couldn't meet the clear and convincing standard under Nevada law for malice, oppression, or fraud. And I would submit to this Court that it's probably the case that when you ask for punitive damages in a complaint and you have to meet a clear and convincing standard, except in the most unusual of cases, you probably don't have enough at the pleading stage, while you may have enough to allege punitive damages, you probably don't have enough to meet a clear and convincing evidence standard. And even if you did, you probably wouldn't include them in your complaint. The district court, what it should have done is it should have looked at both the record and summary judgment where we introduced the documents we were able to get from other parties that made out clearly that punitive damages were appropriate, as well as the trial testimony, before reaching the conclusion about whether we could meet the standard for punitive damages. Now, why do I think we meet the standard? Well, among the evidence that's in both the summary judgment and that was proven at trial are these. First of all, Vision's upper management, when they were contacted by the few employees or other managers who were asking about hazard pay, told them to leave the issue alone and ultimately fired the people that found out about hazard pay. The Vision employees at the earliest stages of the Airbridge program who knew about hazard pay were all fired by Vision and replaced with people who knew nothing about it so Vision could stop paying. Vision misled the United States and the contractors above it by certifying under oath, and we introduced those documents. They're at least the ones we were able to get our hands on. They're attached to the motion for summary judgment that we filed. They misled them by saying that they had paid the hazard pay through to Vision's employees when they knew that they had not. And when one of the Vision managers, the chief of flight operations early in the Airbridge program, raised the issue with one of the upstream contractors with CSC and said, are we supposed to be paying hazard pay? This email is included. It's one of the only ones we were able to get, and we got it, by the way, from the Are we supposed to be paying hazard pay? The upstream person at the contractor above Vision said, are you kidding me? You haven't been paying hazard pay? This could be a complete disaster, either retroactive or refunded, which basically means we have a government contracting problem. You guys are committing contracting fraud. And so what happened after that? Another upper-level Vision manager, Brian Daggett, who's still with the company, testified under oath at his deposition that he called that manager of the company above them and told them, no, no, no, we've been paying hazard pay all along, which, of course, the jury found they had not. I think that that makes that a clear and convincing case for punitive damages. I think we should have been allowed to go to the jury on that or the court – well, the court – let me put that in context, too. Vision demanded a trial by jury here. As your honors know, the law of the circuit is after a default. They're not in – the defaulting party is not entitled to a trial. We told the judge that, and he said, well, I'm going to let them have a jury trial anyway, which is fine. And they took the liberties they took, which we've discussed in our brief and have discussed today. I think the appropriate remedy at this point, though, with regard to punitive damages is to remand for the district judge to hold a hearing on whether we make out a claim for punitive damages and what the amount of those punitive damages should be. I don't think Vision should be entitled to get to pick another jury and make another set of arguments about documents they've never produced to try and get around punitive damages. And, again, you know, part of – I think part of what's most problematic about the district court's ruling on punitive damages is this. If you're in Vision's position or in the position of a defendant that knows it has a serious liability problem, and you know that if you destroy the evidence of your worst conduct and that at the end of the day, because the plaintiffs are going to be held to the complaint, they'll probably not be able to clear the pleading hurdle. You know, they won't be able to clear the evidentiary hurdle of establishing clear and convincing evidence to establish malice, fraud, or abuse. You're incentivized to destroy the proof. It's as if Ford, when they had the Pinto memo, instead of ultimately handing it over, had just shredded it. Because Vision, again, just as they've benefited from not having us prove the damages for Phase I against them, has also benefited because we've not been able to go against them on punitive damages. They have unilaterally, by destroying the evidence in this case, limited their own liability, and that's part of the problem here. And that's why we submit to this Court that this needs to go back down for the limited purpose of the district judge having a hearing to establish Vision's amount of punitive damages that should be imposed against Vision, but otherwise the judgment of the district court should be affirmed. And if the Court has no more questions, I will at this point take my seat. Thank you, Your Honors. I mean, as we wrap up, let me start first with punitive damages. First of all, they didn't make an offer of proof. I mean, the judge made his ruling on the pleadings. It went on to the damage phase, and there was no offer of proof of what they wanted to submit by way of punitive damages. The second point is all these are, for the most part, contract claims, which under Nevada law you can't get punitive damages on. Conversion is a tort claim, isn't it? Conversion is a tort claim, Your Honor. But, again, all they say on that is they plead the conclusion they entitled to hazard pay, and that's a conclusion, not a fact. Let me offer, sometimes analogies can be a little inept, but let me try this one because I think it sort of gets to the point of the merits, or merits argument. Suppose one of Your Honors was going to do a home improvement, like finish out a and you say, I want to finish out my basement. Here's what I want to look at. I want you to do it on a cost plus basis. And he looks at it, and he listens to you, and he says, okay, the carpet's going to cost $2,000, the electrician's going to cost this, the total bill is going to be $15,000, and that includes the $2,000 I'm going to spend on the carpet. And you say, fine, half now, half when they're done. They do the work. They give you exactly what you want. They give you the carpet that you want. But it turns out that when the contractor went and actually was going out and buying the stuff, he could get the exact carpet you wanted for $1,500. And he did that, and he put the $500 in his pocket. In that scenario, who is the wronged party? I submit the wronged party is you who wrote the check. The wronged party is not the supplier of the carpet who sold it for $1,500, not the $2,000 you expected. And that's what we have here. If they're right, if you credit their allegations as the factual allegations as you would on a default, the wronged party here is the upstream partners. The wronged party is the government. The wronged party is not the employees who receive the compensation that they expected to receive. Employment contract is a term of art. Not having an employment contract makes you an employee at will. But an employee at will has a contractual relationship with his employer. We cite the Vinicieri case, 777 Pacific 2nd, 366. Quote, employment at will is a contractual relationship and thus governed by contract law. The judge is trying to examine it, as she said, flight crews agree to a sum certain in their pay before they knew there was money to be paid by hazard pay. If Vision says to the world, I'm going to pay my pilots X and the pilots raise their hand and say, I'll do that and they fly the planes and we pay them X, then that's a compensation agreement. You don't have to sit down and write and sign a contract. If you do the work for the stated compensation, you have a compensation agreement. That's what happened here. That's what the allegations in the complaint establish. Because of that, the complaint fails as a matter of law. And you have to separate that analysis, as indicated in my first part of my argument, separate that analysis from the analysis of whether or not striking the answer was appropriate. That's what this Court has done in the past and that's what we urge this Court to do in this case. Thank you, Your Honor. Thank you, counsel. Thank you. Thank you. Thank you, Your Honor. The case just argued will be submitted. The Court will stand in recess for the day.
judges: Goodwin, Reinhardt, Murguia